# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3516 | **DATE** | 3/28/2001 |
| **CASE TITLE** | CSC Holdings, Inc. vs. J.R.C. Products Inc., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff is hereby awarded total damages in the amount of $29,767,710.00 plus enhanced damages of $50,000 for a total damage award of $29,817,710.00. Defendants are jointly and severally liable for this amount as well as any award of attorneys' fees. This Court will retain jurisdiction to enforce this opinion and judgment.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | MAR 2 9 2001 | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | 14 |
| | Copy to judge/magistrate judge. | | | |
| RO | courtroom deputy's initials | ILED FOR DOCKET... 01 MAR 28 PM 3:1? | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CSC HOLDINGS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 99 C 3516 |
| | ) | |
| | ) | Honorable Ruben Castillo |
| | ) | |
| J.R.C. PRODUCTS INCORPORATED, | ) | |
| OMEGA HOLDINGS, L.L.C., OMEGA | ) | |
| OF ELGIN, INC., TELEVIEW | ) | |
| INCORPORATED, TELEVIEW | ) | |
| DISTRIBUTORS, INC., | ) | |
| FRANK P. REDISI, JR., FRANK P. | ) | |
| REDISI, SR., LANCE RENTLO, | ) | |
| REC-TEC ELECTRONICS, INC., | ) | |
| C & G ELECTRONICS, | ) | |
| JAMES RECCHIA, FRANK RECCHIA, | ) | |
| JOANN RECCHIA, ELISA RECCHIA | ) | |
| a/k/a LISA, ROBERT RECCHIA AND | ) | |
| NORA VILLALOBOS. | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED

MAR 2 9 2001

## MEMORANDUM OPINION AND ORDER

This case concerns the ongoing problem of cable piracy. Plaintiff, CSC Holdings, Inc.

("Cablevision"), brought this action to obtain injunctive relief and monetary damages against

seven business Defendants and nine individual Defendants (collectively "Defendants") for the

sale of pirate cable television decoders in violation of the Cable Communications Policy Act of

1984, 47 U.S.C. § 553, and various state laws. This Court previously granted Cablevision's

summary judgment motion as to the liability of all Defendants except Defendant Anthony

Recchia, who was dismissed from the case. *See CSC Holdings, Inc. v. J.R.C. Prods., Inc.*, 78 F.

Supp. 2d 794 (N.D. Ill. 1999) ("*CSC I*").

It will be assumed that the reader of this opinion is familiar with the prior opinion on liability issued by this Court. Therefore, the facts contained in *CSC I* will only be repeated herein to the extent necessary. This opinion deals with the sole remaining issues of monetary damages and final injunctive relief, which were tried to the Court in a bench trial held on September 14, 2000. Thereafter, this Court received post-trial submissions from the parties.

After a careful review of the parties' submissions, the trial transcripts and the Court's trial notes, the Court hereby enters the following Findings of Fact and Conclusions of Law which are based upon consideration of all the admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that the Findings of Fact, as stated, may be deemed Conclusions of Law, they shall be considered Conclusions of Law. Similarly, to the extent matters expressed as Conclusions of Law may be deemed Findings of Fact, they shall also be considered Findings of Fact.

## FINDINGS OF FACT

### I. Each Defendant's Involvement in Defendants' Overall Decoder Sales Operation

1. Joseph Flaim, a security investigator employed by Plaintiff has been involved in this action since the commencement of Plaintiff's investigation of Defendants. (*See* Joseph Flaim Aff., Supporting Plaintiff's Damages Application ¶ 1, Apr. 14, 2000 ("Flaim Apr. 14 Aff.").) Flaim relied on evidence seized from Defendants' business location and the respective transcripts of the individual Defendant's depositions to determine the length of time each Defendant was involved in Defendants' overall cable television decoder sales operation. (*See* Flaim Supplemental Aff. ¶¶ 3-14, Sept. 7, 2000 ("Flaim Sept. 7 Aff.").)[1]

---

[1] This affidavit served as Flaim's direct testimony at the September 14, 2000 trial.

2.  Flaim's determinations attempted to apportion among the various Defendants, on a year-by-year basis, the amounts of damages, both actual damages and Defendants' profits, that Plaintiff suffered as a result of Defendants' conduct.  (*See infra* ¶ 42.)

**a. Teleview Distributors, Inc.**

3.  Teleview Distributors, Inc. was commenced in 1990 and operated until the end of 1993, when Defendants changed the name of the business to Teleview, Inc.  (*See* Flaim Sept. 7 Aff. ¶ 3.  *See also* PX 69 (Redisi, Jr. Dep.) at 9, 10, 14.)

**b. Teleview, Inc.**

4.  Near the end of 1993, the name of Teleview Distributors, Inc. was changed to Teleview, Inc., which was operational until the end of 1995, when the business became Omega Holdings, L.L.C.  (*See* Flaim Sept. 7 Aff. ¶ 4.  *See also* PX 69 at 9; PX 40 (1993 Teleview Mem. from Frank Redisi, Jr.); PX 41 (1993 Teleview Mem. from Frank Recchia); PX 42 (1994 Teleview Mem. from James Recchia).

**c. Omega Holdings, L.L.C.**

5.  Near the end of 1995, Teleview, Inc. became Omega Holdings, L.L.C., which was operational until the end of 1998.  (*See* Flaim Sept. 7 Aff. ¶ 5.  *See also* PX 69 at 9-10; PX 45 (1995 Omega Internal Telephone List); PX 46 (1998 Omega Letter from Redisi, Jr. and James Recchia).)

**d. Omega of Elgin, Inc./J.R.C. Products Incorporated/Rec-Tec Electronics, Inc./C&G Electronics**

6. In November 1998, Omega of Elgin, Inc. purchased the assets of Omega Holdings, L.L.C. (*See* Flaim Sept. 7 Aff. ¶ 6. *See also* PX 68 (Redisi, Sr. Dep.) at 27-28.) This business, which was functionally the same business as J.R.C. Products Incorporated, Rec-Tec Electronics, Inc. and C&G Electronics, (*see CSC I* at 797), was operational until the seizure conducted on June 2, 1999. (*See* Flaim Sept. 7 Aff. ¶ 6. *See also* PX 68 at 12, 28; PX 48 (Oct. 28, 1998 Amcore Bank Letter Regarding James Recchia Opening an Account for "Omega of Elgin"); PX 49 (Dec. 28, 1998 Letter from James Recchia to the I.R.S. Advising that Omega of Elgin Would be Called J.R.C. Instead); PX 50 (1999 Omega of Elgin Weekly Payroll Checks to Defs. James Recchia, Joann Recchia, Nora Villalobos, Elisa Recchia); PX 51 (J.R.C. Employee Hour Charts for the Same Employees During the Same Time Period); PX 39 (June 1, 1999 Inventory List for JRC, Rec-Tec and C&G); PX 54 (Feb. 27 to Apr. 28, 2000 J.R.C. Checks Totaling $90,280 to C&G Electronics); PX 55 (Rec-Tec Corporation Book); PX 56 (C&G Corporation Book); and PX 57 (Letter from Frank Recchia Referring to Advertisements for Rec-Tec and C&G).)

**e. Frank Redisi, Sr.**

7. Frank Redisi, Sr. was materially involved in the business of Teleview Distributors, Inc. from 1990 through 1993, when the business became Teleview, Inc. (*See* Flaim Sept. 7 Aff. ¶ 7. *See also* PX 69 at 11-12; PX 68 at 8.) Redisi, Sr. was materially involved in the business of Teleview, Inc. from the end of 1993 through the end of 1995, when the business became Omega Holdings, L.L.C. (*See* Flaim Sept. 7 Aff. ¶ 7. *See also* PX 69 at 15; PX 68 at 11 (Redisi, Sr. Invoked Fifth Amendment Privilege).) Redisi, Sr. was materially involved in the business of Omega Holdings, L.L.C. from the end of 1995 through the end of 1998. (*See* Flaim Sep. 7 Aff. ¶ 7. *See also* PX 69 at 75-76; PX 68 at 11, 43 (Redisi, Sr. Invoked Fifth Amendment Privilege).)

4

Redisi, Sr. was materially involved in the business of Omega of Elgin, Inc./J.R.C. Products Incorporated/Rec-Tec Electronics, Inc. from November 1998 through the seizure on June 2, 1999. (*See* Flaim Sept. 7 Aff. ¶ 7. *See also* PX 69 at 49-50; PX 68 at 11, 12, 28; PX 53 (J.R.C. Checks to Redisi, Sr.).)

**f. Frank Redisi, Jr.**

8. Frank Redisi, Jr. was materially involved in the business of Teleview Distributors, Inc. from 1990 through 1993, when the business became Teleview, Inc. (*See* Flaim Sept. 7 Aff. ¶ 8. *See also* PX 69 at 10.) Redisi, Jr. was materially involved in the business of Teleview, Inc. from the end of 1993 through the end of 1995, when the business became Omega Holdings, L.L.C. (*See* Flaim Sept. 7 Aff. ¶ 8. *See also* PX 69 at 9, 15.) Redisi, Jr. was materially involved in the business of Omega Holdings, L.L.C. from the end of 1995 through the end of 1998. (*See* Flaim Sept. 7 Aff. ¶ 8. *See also* PX 69 at 9, 75-76.)

**g. James Recchia**

9. After becoming materially involved in Defendants' overall business when it was still called Teleview Distributors, Inc., James Recchia continued to be materially involved in the business of Teleview, Inc. from the end of 1993 through the end of 1995. (*See* Flaim Sept. 7 Aff. ¶ 9. *See also* PX 69 at 33, 34.) James Recchia was materially involved in the business of Omega Holdings, L.L.C. from the end of 1995 through the end of 1998. (*See id.*) James Recchia, who was present at the June 2, 1999 seizure, (*see* Flaim Apr. 14 Aff. ¶ 9), was materially involved in the business of Omega of Elgin, Inc./J.R.C. Products Incorporated/Rec-Tec Electronics, Inc./C&G Electronics. (*See* Flaim Sept. 7 Aff. ¶ 9. *See also* PX 42; PX 46; PX 48; PX 49; PX 50 (Omega of Elgin Payroll Checks, Including to James Recchia); PX 51 (J.R.C. Employee Time

Sheets, Including James Recchia's); PX 52 (1998 Election by Small Business for Listing James Recchia as officer of J.R.C.); PX 71 (June 15, 1999 Dep. Tr. of James Recchia Invoking Fifth Amendment Privilege in Response to All Substantive Questions).)

**h. Frank Recchia**

10. After becoming materially involved in Defendants' overall business when it was still called Teleview Distributors, Inc., Frank Recchia continued to be materially involved in the business of Teleview, Inc. from the end of 1993 through the end of 1995. (*See* Flaim Sept. 7 Aff. ¶ 10. *See also* PX 69 at 31-33; PX 41.) Frank Recchia was materially involved in the business of Omega Holdings L.L.C. from the end of 1995 through the end of 1998. (*See id.*) Frank Recchia, who was also present at the June 2, 1999 seizure, (*see* Flaim Apr. 14 Aff. ¶ 10), was materially involved in the business of Omega of Elgin, Inc./J.R.C. Products Incorporated/Rec-Tec Electronics, Inc./C&G Electronics. (*See* Flaim Sept. 7 Aff. ¶ 10. *See also* PX 50 (Omega of Elgin Payroll Checks, Including to Frank Recchia); PX 51 (J.R.C. Employee Time Sheets, Including Frank Recchai's); PX 52 (1998 Election by Small Business Form Listing Frank Recchia as Officer of J.R.C.); PX 56 (C&G corporation Book Listing Frank Recchia as President and Secretary); PX 57; PX 70 (June 15, 1999 Dep. Tr. of Frank Recchia Invoking Fifth Amendment Privilege in Response to All Substantive Questions).)

**i. Joann Recchia**

11. After becoming materially involved in defendants' overall business when it was still called Teleview Distributors, Inc., Joann Recchia continued to be materially involved in the business of Teleview, Inc. form the end of 1993 through the end of 1995. (*See* Flaim Sept. 7 Aff. ¶ 11. *See also* PX 69 at 35.) Joann Recchia was materially involved in the business of Omega

6

Holdings, L.L.C. from the end of 1995 through the end of 1998. (*See* Flaim Sept. 7 Aff. ¶ 11. *See also* PX 69 at 36.) Joann Recchia, who was also present at the June 2, 1999 seizure, (*see* Flaim Apr. 14 Aff. ¶ 11), was materially involved in the business of Omega of Elgin, Inc./J.R.C. Products Incorporated/Rec-Tec Electronics, Inc./C&G Electronics. (*See* Flaim Sept. 7 Aff. ¶ 11. *See also* PX 50 (Omega of Elgin Payroll Checks, Including to Joann Recchia); PX 51 (J.R.C. Employee Time Sheets including Joann Recchia's); PX 72 (June 15, 1999 Dep. Tr. of Joann Recchia Invoking Fifth Amendment Privilege in Response to All Substantive Questions).)

**j. Nora Villalobos**

12. After becoming materially involved in Defendants' overall business when it was still called Teleview, Inc., Nora Villalobos continued to be materially involved in the business of Omega Holdings, L.L.C. from the end of 1995 through the end of 1998. (*See* Flaim Sept. 7 Aff. ¶ 12. *See also* PX 69 at 37.) Nora Villalobos, who was also present at the June 2, 1999 seizure, (*see* Flaim Apr. 14 Aff. ¶ 12), was materially involved in the business of Omega of Elgin, Inc./J.R.C. Products Incorporated/Rec-Tec Electronics, Inc./C&G Electronics. (*See* Flaim Sept. 7 Aff. ¶ 12. *See also* PX 50 (Omega of Elgin Payroll Checks, Including to Nora Villalobos); PX 51 (J.R.C. Employee Time Sheets, Including Nora Villalobos's); PX 73 (June 15, 1999 Dep. Tr. of Nora Villalobos Invoking Fifth Amendment Privilege in Response to All Substantive Questions).)

**k. Robert Recchia**

13. Robert Recchia was materially involved in the business of Omega of Elgin, Inc./J.R.C. Products Incorporated/Rec-Tec Electronics, Inc./ C&G Electronics. (*See* Flaim Sept. 7 Aff. ¶ 13. *See also* PX 52 (1998 Election by Small Business Form Listing Robert Recchia as

Officer of J.R.C.); PX 55 (Rec-Tec Corporation Book Listing Robert Recchia as President and Director); PX 74 (June 15, 1999 Dep. Tr. of Robert Recchia Invoking Fifth Amendment Privilege in Response to All Substantive Questions).)

**l. Elisa Recchia a/k/a Lisa**

14. Elisa Recchia a/k/a Lisa was materially involved in the business of Omega of Elgin, Inc./J.R.C. Products Incorporated/Rec-Tec Electronics, Inc./C&G Electronics. (*See* Flaim Sept. 7 Aff. ¶ 14. *See also* PX 50 (Omega of Elgin Payroll Checks, Including to Elisa Recchia); PX 51 (J.R.C. Employee Time Sheets, Including Elisa Recchia's); PX 75 (June 15, 1999 Dep. Tr. of Elisa Recchia Invoking Fifth Amendment Privilege in Response to All Substantive Questions).)

**II. Actual Damages Suffered by Plaintiff as a Result of Defendants' Overall Decoder Sales Operation**

15. Cablevision investigator Joseph Flaim attempted to estimate Plaintiff's actual damages resulting from Defendants' sales of cable television decoding equipment to Plaintiff's subscribers. Flaim performed his actual damages analysis by: (1) determining the number of Plaintiff's subscribers who purchased decoding equipment from Defendants; (2) determining the years in which such purchases were made (in order to determine how long such equipment likely was in use); (3) determining the value of Plaintiff's services to which dishonest subscribes were able to gain unauthorized access through the use of decoding equipment purchased from Defendants; and (4) apportioning liability among the various Defendants based on the length of time of each Defendant's involvement in Defendants' overall decoder sales operations. (*See* Flaim Apr. 14 Aff. ¶¶ 15-25. *See also* Flaim Sept. 7 Aff. ¶¶ 13-36.)

16. In performing his actual damages analysis, Flaim made reasonable assumptions about: (1) the level of services to which the individuals who purchased decoders from Defendants subscribed; (2) such individual's viewing habits, *i.e.*, the amount of premium and pay-per-view programming services they would view; and (3) the lengths of time that the respective decoders were used by their purchasers. (*See* Flaim Apr. 14 Aff. ¶¶ 18, 20-21.) Flaim based these assumptions on his experience, (*see* Trial Tr. at 35), industry experts' findings, (*see id. See also* Stan Durey Aff. ¶ 11, June 11, 1999), and what other District Courts have accepted as reasonable in similar actions where conspiratorial conduct between sellers of illegal decoding equipment and their customers prohibits an aggrieved cable system operator from determining with more certainty its actual damages. (*See* Trial Tr. at 27-28. *See also* Conclusions of Law ¶ 2.)

17. As discussed at length below, Cablevision's inability to precisely quantify its actual damages claim is attributable to two factors beyond Cablevision's control, and properly attributable to the Defendants: (1) Defendants' destruction of their sales records; and (2) the fact that Defendants' products were designed for the sole purpose of enabling their customers to engage in covert, illegal activity in the privacy of their own homes, *i.e.*, the theft of cable television programming services, which activity is not amenable to discovery, much less precise quantification.

**a. Number of Current Cablevision Subscribers Who Purchased Decoders from Defendants**

18. In ascertaining Cablevision's actual damages resulting from Defendants' conduct, Flaim arranged to have downloaded from Defendants' computers (seized by the U.S. Marshall Service pursuant to the May 28, 1999 *ex parte* Temporary Restraining Order) all of Defendants'

records from their various business entities reflecting the sale of pirate decoders. (*See* Flaim Apr. 14 Aff. ¶ 15.)

19. William Moylan of MTS Computer Services performed the downloading of Defendants' seized computers, including Defendants' records of sales of pirate decoders. (*See* William Moylan Aff., Supporting Plaintiff's Damages Application ¶ 4, Apr. 13, 2000 ("Moylan Apr. 13 Aff.").)

20. After receiving the downloaded records, Flaim segregated out, printed and organized by year those records reflecting sales of pirate cable television decoding devices to persons residing within Plaintiff's service area who are current Cablevision subscribers. (*See* Flaim Apr. 14 Aff. ¶ 15.)

21. In segregating out the records, Flaim relied on the following documents that were admitted into evidence: (1) PX 78 (Records of Sales of Decoding Equipment to 2,756 Cablevision Subscribes); and (2) PX 79 (List of Plaintiff's Service Areas). (*See* Flaim Sept. 7 Aff. ¶ 15.)

22. The results of this segregation process were as follows:

| Year | Number of Current Cablevision Subscribers Who Purchased Decoding Devices from Defendants |
|------|------|
| 1992 | 220 |
| 1993 | 1,042 |
| 1994 | 683 |
| 1995 | 298 |
| 1996 | 206 |
| 1997 | 204 |

| Year | Number of Current Cablevision Subscribers Who Purchased Decoding Devices from Defendants |
|------|------|
| 1998 | 69 |
| 1999 | 34 |
| **Total** | **2,756** |

(*See* Flaim Apr. 14 Aff. ¶ 15.)

**b. Cablevision's Losses from Unauthorized Interception and Theft of Premium Services**

23. Cablevision offers different levels of service to its subscribes. (*See CSC I* at 796.)

24. Broadcast Basic, the lowest and least expensive level of service, allows a subscriber to receive only network programming. (*See* Flaim Apr. 14 Aff. ¶ 17.)

25. Family Cable, an intermediate level of service, allows a subscriber to receive network programming plus non-premium scrambled services such as MTV, CNN, TBS, VHI, the Discovery Channel and the History Channel. (*See id.*)

26. Beyond the Family Cable package, Cablevision offers premium services such as HBO, Cinemax and The Movie Channel on a per-service, per-month basis. (*See id.*)

27. A subscriber who purchases "Optimum Gold," the highest level of Cablevision premium service, would receive all of the premium services offered, plus Family and Broadcast Basic Cable. (*See id.*)

28. A subscriber receiving only the basic service who attached a pirate decoder purchased from Defendants to the line running into his or her residence from Cablevision's system would receive all of the Family Cable and premium services offered by Cablevision (in addition to pay-per-view services, which are addressed below). (*See* Flaim Apr. 14 Aff. ¶ 18.)

11

29. For purposes of Cablevision's damages analysis, Flaim assumed that the typical purchaser of decoding equipment from Defendants subscribed to Cablevision's more expensive Family Cable service and utilized the decoding device to receive only Cablevision's premium services (and pay-per-view services, as addressed below). (*See id.*)

30. By assuming that the typical purchaser of decoding equipment from Defendants subscribed to Cablevision's Family Cable service, as opposed to Cablevision's lowest level of service, *i.e.*, Broadcast Basic, and consequently paid for more of the services to which the pirate decoders provided unauthorized access, Cablevision reduced its potential actual damages request by millions of dollars. (*See* Trial Tr. at 108-109.)

31. Cablevision's different cable systems charge an average of $33.17 for a monthly subscription to Family Cable and $73.52 for a monthly subscription to Optimum Gold service. (*See* Flaim Apr. 14 Aff. ¶ 19. *See also* PX 80 (Samples of Cablevision Rate Cards).)

32. For purposes of Cablevision's damages analysis, Flaim took the difference, *i.e.*, $40.25, as the value of premium services (not including pay-per-view services) to which one of the pirate decoders sold by Defendants would provide unauthorized access in one month. (*See* Flaim Apr. 14 Aff. ¶ 19.)

**c. Cablevision's Losses from Unauthorized Interception and Theft of Pay-Per-View Programming Services**

33. As previously noted, in addition to premium services, Cablevision offers pay-per-view services. These include movies, concerts, football games, prizefights and wrestling events that range in cost form $3.95 to $54.95. (*See* Flaim Apr. 14 Aff. ¶ 20. *See also* PX 81 (Sample Cablevision Pay-Per-View Guide).)

34. Dozens of different movies and events are broadcast each month, and many are repeated several times each month. (*See* Flaim Apr. 14 Aff. ¶ 20. *See also* PX 81.)

35. Flaim's calculations assumed that the decoding devices purchased from Defendants were used to view an average of ten low-priced movies (at $3.95 each) and five higher-priced events (at an averaged cost of $15.00 each) each month for a total estimated monthly pay-per-view theft of $14.50.[2] (*See* Flaim Apr. 14 Aff. ¶ 20.)

36. Adding the $40.25 monthly loss for premium services (*see supra* ¶ 32) to the monthly pay-per-view loss of $114.50 (*see supra* ¶ 35), the total estimated monthly loss for one device would be $154.75. Multiplied over twelve months, the annual loss would be $1,857.00 for one device.

**d. Amount of Time Decoder Has Been in Use**

37. Another relevant consideration in Plaintiff's actual damages calculation was the date on which a given pirate decoding device was purchased. The further back in the past a given device was purchased, the longer it likely has been used and the more unauthorized access to premium and pay-per-view services it likely has provided throughout its life. (*See* Flaim Apr. 14 Aff. ¶ 21.)

38. In calculating the actual damages, Flaim assumed that a pirate decoding device has an average useful lifespan of seven years. (*See* Flaim Apr. 13 Aff. ¶ 21. *See also* Trial Tr. at 35; *infra* Conclusions of Law ¶ 8.)

---

[2] If the value of all the services to which the pirate decoders permitted access were included, all of Cablevision's estimates discussed herein would be substantially higher. (*See* Flaim Apr. 14 Aff. n.9. *See also* PX 81.)

39. Flaim also assumed that the devices purchased from Defendants would continue to be used until the end of 1999 (unless its seven-year useful lifespan expired before then).[3]

40. Consequently, Flaim prepared a chart listing each year from 1992 through 1999, the number of current Cablevision subscribers who purchased decoding devices from Defendants during that year, the number of months such devices are deemed to have been in use on Cablevision's system (starting from the first day of January in the year following the sale until the end of 1999), the projected value of services that each individual gained unauthorized access to over the purchased device's useful lifespan or until the end of 1999 (whichever is lower) and the total loss to Cablevision for devices sold each year, as follows:

| Year | Number of Persons Purchasing Decoding Devices | Number of Months Devices Were In Use | Value of Services Per Device | Total Losses for Devices Sold In Year |
|---|---|---|---|---|
| 1992 | 220 | 84 | $12,999.00 | $ 2,859,780.00 |
| 1993 | 1,042 | 84 | $12,999.00 | $13,544.958.00 |
| 1994 | 683 | 72 | $11,142.0 | $ 7,609,986.00 |
| 1995 | 298 | 60 | $ 9,285.00 | $ 2,766,930.00 |
| 1996 | 206 | 48 | $ 7,428.00 | $ 1,530,168.00 |
| 1997 | 204 | 36 | $ 5,571.00 | $ 1,136,484.00 |
| 1998 | 69 | 24 | $ 3,714.00 | $    256,266.00 |
| 1999 | 34 | 12 | $ 1,857.00 | $      63,138.00 |
| **Total** | **2,756** | | | **$29,767,710.00** |

---

[3] In an effort to mitigate its damages, Plaintiff cut-off its actual damages calculation at the end of 1999 because it anticipated taking legal action at that time against its subscribers who purchased decoding equipment from Defendants. (*See* Flaim Apr. 14 Aff. ¶ 21.)

*(See* Flaim Apr. 14 Aff. ¶ 22.)

41. This Court, in its factfinding capacity, believes that the estimated total loss figure of $29,767,710.00 is reasonable and does not overrepresent the level of damages actually caused by Defendants. This Court expressly rejects all of Defendants' arguments that this damage figure is somehow overrepresentative of the amount of losses incurred by Plaintiff in this case. Instead, as indicated herein, this Court believes this damage figure is a rather conservative estimate.

**e. Apportioning Liability Among Defendants**

42. The following chart, when used in conjunction with the lengths of time that the respective Defendants were involved in Defendants' overall decoder sales operation, establishes how this Court's actual damage award of $29,767,710.00 is apportioned among the various Defendants in each year for which sales records exist:

| Year | Total Losses for Devices Sold in Year | Defendants Liable |
|------|----------------------------------------|-------------------|
| 1992 | $ 2,859,780.00 | Teleview Distributors, Inc., Frank Redisi, Sr., Frank Redisi, Jr. |
| 1993 | $13,544,958.00 | Frank Redisi, Sr., Frank Redisi, Jr. |
| 1994 | $ 7,609,986.00 | Teleview, Inc., Frank Redisi, Sr., Frank Redisi, Jr., James Recchia, Frank Recchia, Joann Recchia |
| 1995 | $ 2,766,930.00 | Frank Redisi, Sr., Frank Redisi, Jr., James Recchia, Frank Recchia, Joann Recchia |
| 1996 | $ 1,530,168.00 | Omega Holdings, L.L.C., Frank Redisi, Sr., Frank Redisi, Jr., James Recchia, Frank Recchia, Joann Recchia, Nora Villalobos |
| 1997 | $1,136,484.00. | Omega Holdings, L.L.C., Frank Redisi, Sr., Frank Redisi, Jr., James Recchia, Frank Recchia, Joann Recchia, Nora Villalobos |

| 1998 | $ 179,388.00 | Omega Holdings, L.L.C., Frank Redisi, Sr., James Recchia, Frank Recchia, Joann Recchia, Nora Villalobos |
| 1999 | $ 44,199.00 | Omega of Elgin, Inc./J.R.C. Products Incorporated, Rec-Tec Electronics, Inc., C & G Electronics, Inc., Frank Redisi, Sr., James Recchia, Frank Recchia, Joann Recchia, Nora Villalobos, Robert Recchia, Elisa Recchia a/k/a Lisa |

(*See* Flaim Apr. 14 Aff. ¶ 23.)[4]

## III. Calculations of Gross Revenues Derived from Defendants' Decoder Sales Operation

43. In addition to downloading Defendants' sales records (*see supra* ¶ 19), Moylan also downloaded and analyzed Defendants' gross revenues, as reflected in Defendants' database files. (*See* Moylan Apr. 13 Aff. ¶ 2. *See also* Moylan Supplemental Aff. ¶ 2, Sept. 7, 2000 ("Moylan Sept. 7 Aff.").)[5]

44. Moylan's analysis, which consisted of outputting by quarter the data in the field named "Gross" in one of Defendants' databases, established that Defendants' gross revenues from 1992-1999 totaled $27,115,079.19. (*See* Moylan Apr. 13 Aff. ¶ 3. *See also* PX 76 (Records from Defendants' Database File Named SYSOENT.DAT, Field Named "Gross"); PX 67.)

45. As Defendants' database records do not cover the years 1990-1991, (*see* Moylan Apr.

---

[4] All of Defendants, except Redisi, Sr., were involved in Defendants' overall decoder sales operation for only part of its duration. Consequently, the amounts for which each of Defendants are jointly and severally liable with one or more other Defendants depends on the length of time that each Defendant participated in the sales operation as well as the damages caused to Cablevision by decoder sales during that time. As indicated in ¶¶ 3-14, *supra*, Defendants often became part of the continuing criminal enterprise during the middle of a given year. In order to present a conservative figure for each Defendant's minimum liability, Flaim only listed a Defendant as liable for those full years (except 1999, as the Defendants' business was shut down in the middle of that year) in which they were engaged in the sales operation.

[5] This affidavit served as Moylan's direct testimony at the September 14, 2000 trial.

13 Aff. ¶ 3), Flaim consulted Redisi, Jr.'s Plea Agreement (obtained from a criminal case in which Redisi, Jr. pleaded guilty to violating 47 U.S.C. § 553) to determine Defendants' gross revenues from 1990-1991. (*See* Flaim Apr. 14 Aff. ¶ 26, n.14. *See also* PX 77.) Redisi, Jr.'s Plea Agreement indicates that Defendants sold approximately 25,000 units for approximately $150 each (totaling $3,750,000) in the approximately three-year period from 1990 through November 1992 (approximately $1,250,000 per year). (*Id.*) Accordingly, as set forth in the chart in ¶ 46, *infra*, the gross revenue figures for 1990-1991 are approximately $1,250,000 per year. (*Id.*) This is likely a conservative figure because Defendants' revenues for 1992 (one of the years that Redisi, Jr. estimated Defendants' revenues were $1,250,000) were actually just under $4.8 million according to Defendants' database records.

46. Defendants have not produced any evidence of their profits (or lack thereof) or deductible expenses from their gross revenues.

47. Flaim applied the gross revenue figures from Moylan's analysis and Redisi, Jr.'s Plea Agreement to the time periods of each Defendant's involvement. The Court hereby adopts Flaim's analysis without modification and determines, as indicated below, the extent to which the respective Defendants were responsible for the overall businesses' gross revenues, as follows:

| Year | Gross Revenues | Defendants Liable |
|------|---------------|-------------------|
| 1990 | $1,250,000.00 | Teleview Distributors, Inc. Frank Redisi, Sr. Frank Redisi, Jr. |
| 1991 | $1,250,000.00 | Teleview Distributors, Inc. Frank Redisi, Sr. Frank Redisi, Jr. |
| 1992 | $4,759,359.80 | Teleview Distributors, Inc. |

|      |                    | Frank Redisi, Sr.<br>Frank Redisi, Jr. |
|------|--------------------|----------------------------------------|
| 1993 | $5,112,147.47 | Teleview, Inc.<br>Frank Redisi, Sr.<br>Frank Redisi, Jr. |
| 1994 | $5,005,902.65 | Teleview, Inc.<br>Frank Redisi, Sr.<br>Frank Redisi, Jr.<br>James Recchia<br>Frank Recchia<br>Joann Recchia |
| 1995 | $4,068,845.77 | Frank Redisi, Sr.<br>Frank Redisi, Jr.<br>James Recchia<br>Frank Recchia<br>Joann Recchia |
| 1996 | $3,194,771.13 | Omega Holdings, L.L.C.<br>Frank Redisi, Sr.<br>Frank Redisi, Jr.<br>James Recchia<br>Frank Recchia<br>Joann Recchia<br>Nora Villalobos |
| 1997 | $2,569,516.14 | Omega Holdings, L.L.C.<br>Frank Redisi, Sr.<br>Frank Redisi, Jr.<br>James Recchia<br>Frank Recchia<br>Joann Recchia<br>Nora Villalobos |
| 1998 | $1,693,835.40 | Omega Holdings, L.L.C.<br>Frank Redisi, Sr.<br>James Recchia<br>Frank Recchia<br>Joann Recchia<br>Nora Villalobos |

| 1999 | $ 710,700.83 | Omega of Elgin, Inc. |
| | | J.R.C. Products, Inc. |
| | | Rec-Tec Electronics, Inc. |
| | | C&G Electronics |
| | | Frank Redisi, Sr. |
| | | James Recchia |
| | | Frank Recchia |
| | | Joann Recchia |
| | | Nora Villalobos |
| | | Robert Recchia |
| | | Elisa Recchia a/k/a Lisa |

**Total:** **$29,615,079.19**

(*See* PX 76. *See also supra* ¶¶ 3-14.)

48. By combining the information on the charts contained in ¶¶ 41 and 46, *supra*, the Court determined that each Defendant's respective liability for both elements of Plaintiff's damages, *i.e.*, actual damages and profits, are as follows:

| Year | Actual Damages | Gross Revenues | Total | Defendants Liable |
|------|----------------|----------------|-------|-------------------|
| 1990 | N/A | $1,250,000.00 | $1,250,000.00 | Teleview Distributors, Inc. |
| | | | | Frank Redisi, Sr. |
| | | | | Frank Redisi, Jr. |
| 1991 | N/A | $1,250,000.00 | $1,250,000.00 | Teleview Distributors, Inc. |
| | | | | Frank Redisi, Sr. |
| | | | | Frank Redisi, Jr. |
| 1992 | $2,859,780.00 | $4,759,359.80 | $7,619,139.80 | Teleview Distributors, Inc. |
| | | | | Frank Redisi, Sr. |
| | | | | Frank Redisi, Jr. |
| 1993 | $13,544,958.00 | $5,112,147.47 | $18,657,105.47 | Frank Redisi, Sr. |
| | | | | Frank Redisi, Jr. |
| 1994 | $7,609,986.00 | $5,005,902.65 | $12,615,888.65 | Teleview, Inc. |
| | | | | Frank Redisi, Sr. |
| | | | | Frank Redisi, Jr. |
| | | | | James Recchia |

| | | | | |
|---|---|---|---|---|
| | | | | Frank Recchia |
| | | | | Joann Recchia |
| 1995 | $2,766,930.00 | $4,068,845.77 | $6,835,775.77 | Frank Redisi, Sr. |
| | | | | Frank Redisi, Jr. |
| | | | | James Recchia |
| | | | | Frank Recchia |
| | | | | Joann Recchia |
| 1996 | $1,530,168.00 | $3,194,771.13 | $4,724,939.13 | Omega Holdings, L.L.C. |
| | | | | Frank Redisi, Sr. |
| | | | | Frank Redisi, Jr. |
| | | | | James Recchia |
| | | | | Frank Recchia |
| | | | | Joann Recchia |
| | | | | Nora Villalobos |
| 1997 | $1,136,484.00 | $2,569,516.14 | $3,706.000.14 | Omega Holdings, L.L.C. |
| | | | | Frank Redisi, Sr. |
| | | | | Frank Redisi, Jr. |
| | | | | James Recchia |
| | | | | Frank Recchia |
| | | | | Joann Recchia |
| | | | | Nora Villalobos |
| 1998 | $256,266.00 | $1,693,835.40 | $1,950,101.40 | Omega Holdings, L.L.C. |
| | | | | Frank Redisi, Sr. |
| | | | | Frank Redisi, Jr. |
| | | | | James Recchia |
| | | | | Frank Recchia |
| | | | | Joann Recchia |
| | | | | Nora Villalobos |
| 1999 | $63,138.00 | $710,700.83 | $773,838.83 | Omega of Elgin, Inc. |
| | | | | J.R.C. Products, Inc. |
| | | | | Rec-Tec Electronics, Inc. |
| | | | | C&G Electronics |
| | | | | Frank Redisi, Sr. |
| | | | | James Recchia |
| | | | | Frank Recchia |
| | | | | Joann Recchia |
| | | | | Nora Villalobos |
| | | | | Robert Recchia |

**Total: $29,767,710.00**        **$29,615,079.19**        **$59,382,789.19**

49. The Court expressly finds that the relationship between the Court's estimated actual

damages of $29,767,710.00 and the gross revenues of $29,615,079.19 displays that the estimated

damages losses are very conservative in nature because it is extremely unlikely that consumers

would pay the same amount of money to receive an equivalent value in pirate cable services.

Instead, it is more likely than not that consumers of pirate cable services paid substantially less

for their boxes than the actual value of cable services they obtained from Defendants.

## CONCLUSIONS OF LAW

1. Cablevision is entitled to an award of the actual damages it suffered as a result of

Defendants' decoder sales operation pursuant to 47 U.S.C. § 553(c)(3)(A)(i), which provides that

an aggrieved party can recover as follows:

> [T]he party aggrieved may recover the actual damages suffered by him as a result of the
> violation and any profits of the violator that are attributable to the violation which are not
> taken into account in computing the actual damages suffered by him as a result of the
> violation and any profits of the violator that are attributable to the violation which are not
> taken into account in computing the actual damages; in determining the violator's profits,
> the party aggrieved shall be required to prove only the violator's gross revenues, and the
> violator shall be required to prove his deductible expenses and the elements of profit
> attributable to factors other than the violation.

*Id.*

2. Flaim's analysis of Cablevision's actual damages was based on a formula that has been

accepted by another Federal court in *Century ML-Cable Corp. v. Carrillo Diaz*, 39 F. Supp. 2d

121, 124 (D.P.R. 1999) (accepting cable operator's projection that each pirate decoder resulted in

$591.60 in monthly losses from premium and pay-per-view services, and $60,000 in losses over

a device's lifespan).  *See also Time Warner Entm't/Advance-Newhouse P'ship v. Worldwide Elecs., L.C.*, 50 F. Supp. 2d 1288, 1300-01 (S.D. Fla. 1999) (awarding actual damages based upon lost monthly revenue of $362.14); *United States v. Dulaney*, No. 5:99 CR 18 (D.W. Va. Mar. 29, 2000) (Stamp, C.J.) (awarding actual damages based upon lost monthly revenue of $362.14).  Indeed, Flaim's analysis used a substantially lower monthly estimate of lost revenue (*i.e.*, $154.75) than the estimates that were accepted by these other Federal courts.

3.  Contrary to Defendants' assertions, Plaintiff need not prove its actual damages with scientific or mathematical precision.  Indeed, damages claims for lost revenues or profits, by their very nature, involve an element of speculation because they never accrued due to Defendants' conduct.

4.  The Seventh Circuit has repeatedly held that, in such instances, estimates are completely appropriate.  In *Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788 (7th Cir. 1989), the Seventh Circuit upheld a district court's award of damages based on estimated lost profits.  *See also BE&K Constr. Co. v. Will & Grundy Counties. Bldg. Trades Council*, 156 F.3d 756 (7th Cir. 1998); *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226 (7th Cir. 1982).

5.  Pirate decoding devices such as those sold by the defendants permit theft of cable television services for seven to ten years.  *Century ML-Cable*, 39 F. Supp. 2d at 124 (pirate decoders have a useful lifespan of seven to ten years) (citing *Time Warner Cable v. Cable Box Wholesalers*, 920 F. Supp. 1048, 1053 (D. Ariz. 1996).  (*See also* Trial Tr. at 35; Stan Durrey Aff. ¶ ll, June 11, 1999.)

6. The Court concludes that Flaim's actual damages analysis is reasonable, valid and reliable under the circumstances. *See H.H. Robertson Co. v. V.S. DiCarlo Gen. Contractors, Inc.*, 950 F.2d 572 (8th Cir. 1991).

7. The legislative history of 47 U.S.C. § 553 confirms that the profits recovery provision was meant to provide an alternative method of recovery for any aggrieved cable operator who commences a civil action against any entity involved in cable piracy:

> Under subparagraph (3)(A) the court is granted authority to award damages based on either of two methods of computation. The aggrieved party, pursuant to (3)(A)(i), may recover actual damages and all profits of the violator attributable to the violation, including those profits attributable to the violation where it also occurred outside of the local area of the individual cable system, that are not taken into account in calculating actual damages. In determining the violator's profits, the party aggrieved shall have the burden of establishing the violator's gross revenues by the best means available, while the violator shall have the burden of any expenses he incurred which are normally deductible in determining profit, as well as any profit or revenues which are attributable to factors other than the violation.

H.R. 98-934, 98th Cong., 2d Sess. 85 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4721.

8. In *CSC Holdings, Inc. v KDE Elecs. Corp.*, No. 99-1556, 2000 WL 284005 (N.D. Ill. March 13, 2000) (Pallmeyer, J.), this Court concluded that an aggrieved cable operator is entitled to an award of all Defendants' profits derived from its pirate decoder business, whether or not such profits were derived from sales of pirate decoders into that cable operator's system areas. *Id.* at *5 (finding that "[a]ll of Defendants' profits may be awarded to Plaintiff, whether or not such profits were derived from the sale of pirate decoders into Plaintiff's system areas"). However, Judge Pallmeyer did not award any actual or enhanced damages. *Id.* at *6.

9. The *KDE Elecs.* decision followed the holding in *Worldwide Elecs.*, 50 F. Supp. 2d at 1299-1300. In reaching its decision, the *Worldwide Elecs.* court cited the above-quoted

legislative history of § 553, also cited by the Court in *KDE Elecs.* It determined that this paragraph manifested Congress' intent that the actual damages and profits section provide an incentive to an aggrieved cable operator who, acting in the capacity of a private attorney general, commenced a civil action against a person or entity involved in cable piracy. The *Worldwide Elecs.* decision awarded unspecified actual damages and profits as well as enhanced damages, attorney's fees and injunctive relief..

10. Given the circumstances presented in this lawsuit, this Court declines to follow the *Worldwide Elecs.* precedent of awarding both actual damages and profits to Cablevision. The Court believes that these two types of damage recoveries were to be primarily alternative methods and were only to be combined in unique situations not presented by the facts of this case.

11. The Court fundamentally concludes that the methods used by Flaim in calculating actual damages necessarily includes elements of the revenue or profits taken in by Defendants. In fact, it was this sales revenue which formed the basis for the projected resulting damages generated from the sale of pirated cable boxes. Given these circumstances, any award of profits in addition to actual damages would result in an unfounded expansion of damages because these profits were taken into account in calculating actual damages. The Court therefore rejects Cablevision's request for a total combined damage award of $59,382,789.19.

12. The Court has, however, set forth in ¶ 47 Defendants' gross revenues because the Court has, in part, relied on this number in calculating the slightly higher actual damages awarded herein.

13.  The Flaim and Moylan affidavits submitted in support of Plaintiff's damages application satisfy the requisite showing of Defendants' gross revenues pursuant to 47 U.S.C. § 553(c)(3)(A)(i).  As provided for in § 553(c)(3)(A)(i), Defendants, for their part, were required to produce evidence of their expenses and other amounts which would be deducted from the gross revenue number Plaintiff produced from Defendants' computerized records.  Defendants did not do so.

14.  In essence, the Court concludes that Plaintiff has established by a preponderance of the evidence, as set forth in ¶ 47 herein, that its actual damages were $29,767,710.00 and that Defendants' gross revenues were $29,615,079.19.

15.  Since Defendants' gross revenues of $29,615,079.19 have been taken into account by the Court in arriving at the resulting total damages figure of $29,767,710.00, Cablevision is not entitled to both alternative damage calculations by the express terms § 553(c)(3)(A)(i).

16.  Since the actual damage figure is slightly higher, the Court has decided to award Cablevision total actual damages of $29,767,710.00.

17.  Cablevision has also requested an award of enhanced damages of up to $50,000.00 under § 553(c)(3)(B) that can be assessed in the Court's discretion against a defendant, such as Defendants herein, who willfully committed violations of § 553 for purposes of commercial advantage or private financial gain.

18.  As the Supreme Court noted in *Trans World Airlines v. Thurston*, 469 U.S. 111, 127 (1985), the standard for willfulness in a civil case is lower, requiring proof only of "a disregard for the governing statute and an indifference to its requirements."  *Id.*  The standard of willfulness set forth in *Thurston* has been adopted in actions under the Cable Communications

Policy Act. *See Cable/Home Communication Corp. v. Network Prods., Inc.*, 902 F.2d 829, 851 (11th Cir. 1990).

19. In *Gen. Instrument Corp. v. Nu-Tek Elecs. & Mfg., Inc.*, No. 93-3854, 1997 WL 325804 (E.D. Pa. June 4, 1997) (Gawthrop, J.), *aff'd*, 197 F.3d 83 (3d Cir. 1999), the court awarded the full measure of discretionary damages against a similar pirate decoder operation and stated the following:

> As for the punitive damages here, anything less than $50,000 would be uncalled for. The defendant, speaking through its president and CEO, Mr. David J. Abboud, made huge sums of money, well knowing that it was–and he was–repeatedly and brazenly flouting the law in so doing. Mr. Abboud's testimony at trial, in which he sanctimoniously sought to profess ignorance of that reality, was an exercise in rank perjury. At $50,000, he gets off cheap.

*Id.* at *3. In *Worldwide Elecs.*, the court noted that the parasitic relationship that the pirate decoder sellers bore in relation to the legitimate cable television industry was further evidence of their intent to assist in the interception of cable television services and warranted an award of enhanced damages. *Worldwide Elecs.*, 50 F. Supp 2d at 1301 (stating that "[i]ndeed, they intended that such harm, in the form of lost revenues, take place and their business depended on their customers being able to access [the plaintiff cable company's] services without payment to it").

20. The concerted and large scale effort of Defendants directed against Cablevision and other cable operators, conducted despite their unquestionable knowledge of the illegality of their actions, mandates that the maximum assessment of $50,000.00 in enhanced damages be imposed. *See, e.g., id.* at 1302 (awarding $50,000.00 in enhanced damages against defendants who continued pirate decoder sales business after prior lawsuit by other cable operator).

21. The undisputed facts demonstrating that Defendants acted in concert in Defendants' overall decoder sales operation mandate that they be held jointly and severally liable for the damages amounts as set forth in ¶ 47, *supra*, for the respective years that they were involved in Defendants' overall business operation, as well as the enhanced damage award of $50,000.00. As the Seventh Circuit stated:

> A tort victim can obtain only one recovery for his harm, no matter how many tortfeasors inflicted it. . . . This principle is seen most clearly in cases where a group of tortfeasors inflicts an indivisible harm, as for example where one tortfeasors places a bucket under the plaintiff's chair, another fills it with gasoline, and a third drops a match into it, causing it to explode and injure the plaintiff. Because the injury is indivisible each tortfeasor is liable for the full harm.

*Bosco v. Serhant*, 836 F.2d 271, 280 (7th Cir. 1987). *See also In re Uranium Antitrust Litig.*, 617 F.2d 1248 (7th Cir. 1980) (finding that "[j]oint or common liability arises when a tortious act is committed by several persons acting in concert. It means that each tortfeasor is entirely responsible for the damages resulting from that concerted conduct").

22. Under § 553, the Court may award recovery of full costs, including reasonable attorneys' fees, to a prevailing aggrieved party. *See Nu-Tek Elecs.*, 197 F.3d at 92 (upholding lower court's award of attorneys' fees); *Cont'l Cablevision, Inc. v. Poll*, 124 F.3d 1044, 1046 (9th Cir. 1997) (noting district court's award of attorneys' fees); *Int'l Cablevision, Inc. v. Sykes*, 997 F.2d 999, 1009 (2d Cir. 1993) (same); *KDE Elecs.*, 2000 WL 284005 at *6 (granting attorneys' fees after trial); *Worldwide Elecs.*, 50 F. Supp. 2d at 1302; *Am. Cablevision v. McGinn*, 817 F. Supp. 317, 320 (E.D.N.Y. 1993). Full costs include recovery of investigative costs. *Nu-Tek Elecs.*, 197 F.3d at 92 n.6 (upholding award of investigation costs); *KDE Elecs.*, 2000 WL 284005 at *6 (awarding investigative expenses); *Worldwide Elecs.*, 50 F. Supp. 2d at 1302

(same); *Time Warner Cable v. U.S. Cable T.V., Inc.*, 920 F. Supp. 321, 332 (E.D.N.Y. 1996) (awarding investigation expenses necessitated by the defendants' contumacious actions taken in violation of court order and Communications Act); *In re Cohen*, 121 B.R. 267, 269 (Bankr. E.D.N.Y. 1990) (award of investigative fees pursuant to § 553 as part of overall damage assessment against similar pirate decoder distributor).

23. An award of the reasonable attorneys' fees and expenses Cablevision incurred in investigating Defendants and prosecuting this action is warranted under the circumstances. *KDE Elecs.*, 2000 WL 284005 at *6 (holding that "[t]he court believes that Plaintiff should not have to bear the burden of investigating and 'prosecuting' Defendants' illegal conduct"). *See also Worldwide Elecs.*, 50 F. Supp. 2d at 1302. Accordingly, Plaintiff is directed to file an application for an award of attorneys' fees and expenses by April 30, 2001. Defendants shall be jointly and severally liable for any award of attorneys' fees and expenses.

24. Section 553 contains a provision authorizing the Court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations . . . ." 47 U.S.C. § 553(c)(2)(A).

25. When express authority for issuance of "statutory" injunctions is provided by legislative enactment, an injunction may issue without resort to the traditional "equitable" prerequisites of such relief. *See TKR Cable Co. v. Cable City Corp.*, 1996 WL 465508, No. 96-2877 at *10 (D.N.J. Apr. 19, 1999) (Brown, J.); *Time Warner Cable v. Freedom Elecs.*, 897 F. Supp. 1454, 1460 (S.D. Fla. 1995) (citing *Burlington N.R. Co. v. Dep't of Revenue*, 934 F.2d 1064, 1074-5 (9th Cir. 1991); *Duke v. Uniroyal, Inc.*, 777 F. Supp. 428, 432-3 (E.D.N.C. 1991)

(court found that it could issue an injunction without evaluating traditional factors); *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Reserve Sys.,* 628 F. Supp. 1438 (D.D.C. 1986).

26. The Court finds that Plaintiff is entitled to a permanent injunction pursuant to 47 U.S.C. § 553(c)(2)(A). Accordingly, the Court orders the following:

**ORDERED, ADJUDGED AND DECREED** that Defendants, their agents, employees, affiliates and any business entities and/or persons controlled directly or indirectly by them or acting on their behalf or in concern with them, are hereby permanently enjoined and restrained from the sale, transfer, advertisement (including advertisement on the Internet or other on-line service), promotion and/or offer for sale, modification, manufacture and distribution of cable television decoding devices and related equipment and/or the rendering of any assistance whatsoever in the sale, transfer, advertisement, modification, manufacture or distribution of such equipment, with such equipment including but not limited to cable television decoders, converters (if modified so as to be capable of decoding scrambled cable transmissions or if connected to other decoding equipment described herein), descramblers, descrambling cubers or "programmers," converter-decoder combination units, integrated circuits, quick boards, smart boards, test kits, chips, E proms and circuit boards.

27. Since the time of the seizure pursuant to the Temporary Restraining Order ("TRO"), the vast majority of decoding devices comprising Defendants' inventory remain at their business location and cannot be moved or disposed of pursuant to the Preliminary Injunction. The permanent injunctive relief granted herein permanently enjoins Defendants pursuant to 47 U.S.C. § 553(c)(2)(A) from, *inter alia,* further possession, use, manufacture, modification, sale or distribution of decoding devices. This relief prevents Defendants from ever conducting any such

29

business again. The seized items and decoding devices, therefore, have little if any value to Defendants or in the legitimate marketplace. These decoding devices and components, as first identified in the TRO, have no legitimate use or market value, and the Court directs that Defendants surrender them within thirty (30) days to Cablevision for destruction.

28. With respect to the seized records and sample of Defendants' inventory of decoding equipment, Cablevision shall dispose of the sample decoding devices along with the decoding devices Defendants will surrender to them, and shall, within thirty (30) days, return to Defendants the seized records.

29. Prior to returning such records, Cablevision may copy such records in order that it, its affiliates and other cable system operators can pursue their subscribers and others violating the Cable Policy Communications Act by their resale and use of pirate decoders. In *Time Warner Cable v. M.D. Elecs., Inc.,* 101 F.3d 278 (2d Cir. 1996), the Second Circuit recognized that a district court's order requiring a pirate decoder seller to produce such information was "directed at preventing continued allegedly criminal behavior." *Id.* at 281. The court noted that, "Time Warner of course has the right to attempt to stamp out such piracy of its own cable signals," and the court stated further that, "[p]ermission to obtain this limited discovery regarding third parties appears to be a reasonable request." *Id.* at 281-82. *See also Worldwide Elecs.,* 50 F. Supp. 2d at 1303.

30. In light of the Court's final determination on the merits in Cablevision's favor, the Clerk of the Court is ordered to release the bond Plaintiff filed in this action to secure the relief granted to it in the TRO previously issued by this Court.

## CONCLUSION

For all the reasons contained herein, the Court hereby awards Cablevision total damages of $29,767,710.00 plus enhanced damages of $50,000.00 for a total damage award of $29,817,710.00. Defendants, as indicated herein, will be jointly and severally liable for this amount as well as for the future award of reasonable attorneys' fees. Cablevision's request for permanent injunctive relief is also granted as indicated herein. The Court will retain jurisdiction to enforce this opinion and judgment.

Entered:

**Judge Ruben Castillo**
**United States District Court**

**Dated: March 28, 2001**